UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

GARY R. CASTEN,                                         :

      Plaintiff,                                     :

vs.                                                     :

DuPONT DE NEMOURS, INC.,                                :
as successor-in-interest to E. I. du Pont de
Nemours and Company;                                    :
FIRST CHEMICAL CORPORATION; and,
HONEYWELL INTERNATIONAL                                 :
INC., as successor-in-interest to Allied
Chemical Corporation,                                   :

      Defendants.                                    :

-----------------------------------------------------------------

**PLAINTIFFS' ORIGINAL
COMPLAINT,
JURY TRIAL DEMAND, and
15 U.S.C § 2619 NOTICE**

Civil Action No.

The Plaintiff, GARY R. CASTEN, by his attorneys, STEVEN H. WODKA,

ATTORNEY-AT-LAW, and LIPSITZ & PONTERIO, LLC, for his complaint against each

and every defendant, alleges:

## I. JURISDICTION.

1.    Jurisdiction over the subject matter of this case is based upon the

complete diversity of the citizenship of the parties as set forth under 28 U.S.C.

§1332(a), and the amount in controversy which exceeds, exclusive of interest and

costs, the sum of Seventy-Five Thousand ($75,000.00) Dollars.

2.    The Court has personal jurisdiction over the Defendants based upon:

      a.    The Business Corporation Law of the State of New York; and,

      b.    Section 302 of the Civil Practice Laws and Rules of the State of

New York.

3.     At all relevant times, the Defendants were engaged in the business of developing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce and into the State of New York their products, including ortho-toluidine.

4.     At all relevant times, the Defendants committed tortious acts within the State of New York, out of which this cause of action has arose.

## II.  VENUE.

5.     The Plaintiff's claim arose due to the exposure of GARY R. CASTEN to the chemical product ortho-toluidine while employed at The Goodyear Tire & Rubber Company in Niagara Falls, New York from August 18, 1965, when he was 18 years old, to February 27, 2004.   In addition, the Plaintiff resides within the district in Niagara Falls, New York.  Therefore, venue is proper in the Western District of New York under 28 U.S.C. §1391(b).

## III.  PARTIES.

6.     The Plaintiff, GARY R. CASTEN, is a citizen of the State of New York.

7.     The defendant DuPONT DE NEMOURS, INC. is a Delaware corporation with its principal place of business in Delaware; said corporation may be served through its registered agent.

8.     The defendant FIRST CHEMICAL CORPORATION is a Mississippi

2

corporation with its principal place of business in Delaware; said corporation may be served through its registered agent.

9.      The defendant HONEYWELL INTERNATIONAL INC. is a Delaware corporation with its principal place of business in North Carolina; said corporation may be served through its registered agent.

### IV.  NATURE OF THE CASE.

10.     This matter is a personal injury action.  Plaintiff GARY R. CASTEN has contracted urothelial cancer and seeks damages against these Defendants due to their manufacture and distribution of the industrial chemical ortho-toluidine, which was sold in commerce to the Plaintiff's employer, The Goodyear Tire & Rubber Company (hereinafter, "Goodyear") in Niagara Falls, New York.

11.     During his employment at the Goodyear plant in Niagara Falls, Plaintiff GARY R. CASTEN absorbed significant quantities of the Defendants' ortho-toluidine through his exposure to its vapor, liquid, and its contamination of his work environment. His exposure to ortho-toluidine was a substantial contributing cause of his stage 4, invasive urothelial cancer, which was diagnosed on September 17, 2020.  According to Campbell-Walsh Urology (11th Ed.), studies indicate that patients with this type and stage of cancer have a rate of survival of between 0% to 5% at five years after diagnosis.

12.     The International Agency for Research on Cancer (IARC) has classified

ortho-toluidine into its highest category, Group 1, because it "is carcinogenic to humans." According to the IARC, "ortho-toluidine causes cancer of the urinary bladder." IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 99 (2010) at 451.

13.     The United States National Toxicology Program (NTP) has classified ortho-toluidine as "known to be a human carcinogen based on sufficient evidence of carcinogenicity from studies showing that it causes urinary-bladder cancer in humans." The Report on Carcinogens, Thirteenth Edition, National Toxicology Program, U.S. Department of Health and Human Services (2014).

14.     On December 13, 2019, Defendants DuPONT and FIRST CHEMICAL stated before this Court that "the only reliable and relevant studies for assessing" bladder cancer risk among the workers at the Goodyear plant are: (a) Hanley KW, Viet SM, Hein MJ, et al., "Exposure to o-toluidine, aniline, and nitrobenzene in a rubber chemical manufacturing plant: a retrospective exposure assessment update," J Occup Environ Hyg 9:478–90 (2012), and (b) Carreón T, Hein MJ, Hanley KW, Viet SM, Ruder AM, "Bladder cancer incidence among workers exposed to o-toluidine, aniline and nitrobenzene at a rubber chemical manufacturing plant," Occup Environ Med 71(3): 175-182 (2014). According to these two studies, Plaintiff GARY R. CASTEN accumulated 96,715 unit-days of exposure at the Goodyear plant and consequently had a greater than 10-fold statistically significant excess risk of developing bladder cancer in

4

comparison to other residents of New York State.

15.     The Plaintiff absorbed the Defendants' ortho-toluidine into his body because the Defendants: (a) failed to provide adequate warnings and instructions regarding the extraordinary precautions that are required in order to prevent worker exposure to ortho-toluidine, (b) failed to provide adequate warnings of the potential carcinogenicity of ortho-toluidine, and (c) failed to provide adequate warnings that worker exposure to ortho-toluidine must be monitored by urine sampling and adequate instructions for conducting such monitoring.

16.     The Plaintiff's urothelial cancer has caused him to suffer severe mental anguish and depression and other mental suffering, as well as physical pain, and impaired his ability to enjoy a normal life, including the surgical excision of his left kidney, ureter, and bladder cuff.

17.     The Plaintiff has incurred and will incur medical expenses in the treatment of his physical injuries.  Said injuries are progressive and irreversible.  The Plaintiff will continue to suffer the aforementioned impairments and economic losses in the future.

18.     This cause of action is predicated on products liability theories of strict liability and negligence, as more specifically set out herein.

19.     In that each exposure to ortho-toluidine caused or contributed to the Plaintiff's injuries, the Plaintiff alleges that the doctrine of joint and several liability should apply to each Defendant herein.

5

20.     If it is deemed that Article 16 of the CPLR applies to this action, the Plaintiff asserts that this action falls within one or more of the exceptions set forth in CPLR 1602 including, but not limited to, the exception for cases where a person is held liable for causing the claimant's injury by having acted with reckless disregard for the safety of others; the exception for cases involving any person held liable for causing the claimant's injury by having unlawfully released into the environment a substance hazardous to public health, safety or the environment; and the exception for any parties found to have acted knowingly or intentionally and in concert to cause the acts or failures upon which liability is based.

21.     The Defendants, acting in concert, failed to disclose to or warn the Plaintiff and those similarly situated of the known dangers associated with the use of Defendants' products.  Defendants' concerted action took either the form of an express or implied agreement not to warn or was achieved by providing substantial assistance or encouragement to one another in their wrongful course of conduct.  As a result of Defendants' concerted action, the Plaintiff suffered the aforementioned personal injuries.

## V.  <u>FACTUAL BACKGROUND</u>.

22.     Hereinafter, Defendant DuPONT DE NEMOURS, INC. is designated as "DuPont," Defendant FIRST CHEMICAL CORPORATION is designated as "First Chemical," and HONEYWELL INTERNATIONAL INC. is designated as "Allied

Chemical."

23.     In 1919, DuPont began manufacturing ortho-toluidine at its Chambers Works in Deepwater (Salem County), New Jersey.

24.     In 1921, the International Labour Office, which was established by the League of Nations, specifically identified "toluidine" as a "product" which "may cause tumour of the bladder."

25.     Ortho-toluidine is part of a family of chemicals known as aromatic amines. Beta-naphthylamine, alpha-napthylamine, and benzidine are also aromatic amines.  By 1991, DuPont had identified more than 450 cases of bladder cancer among Chambers Works employees who had been exposed to aromatic amines, including ortho-toluidine.

26.     DuPont physicians recognized the first cases of occupational bladder cancer at the Chambers Works in 1931.  For the next several years, these physicians documented a rapidly growing epidemic.  By 1936, at least eighty-six cases of bladder cancer had been recognized.  By 1938, the number had grown to one hundred.

27.     In order to investigate the cause of the bladder cancer cases at the Chambers Works, DuPont formed the Haskell Laboratory for Toxicology and Industrial Medicine, and hired Wilhelm Hueper, MD, as one of its first toxicologists.  Within a few years, Hueper developed an animal model for testing the ability of an aromatic amine to cause bladder cancer.  DuPont scientists demonstrated that dogs developed bladder cancer after long-term exposure to beta-naphthylamine.  The Haskell Laboratory had

the capability of testing ortho-toluidine using the same animal model anytime after 1935, but DuPont never chose to perform such a study.

28.     In 1940, a Japanese researcher named Morigami published in English the result of the first cancer study of ortho-toluidine with exposed laboratory animals. Bladder tumors were produced in rabbits which had been injected subcutaneously with ortho-toluidine.  Rats developed bladder tumors when their skin was painted with ortho-toluidine.

29.     In 1948, DuPont's Medical Director, George H. Gehrmann, MD, DuPont's Haskell Laboratory Director, John H. Foulger, MD, and DuPont's Assistant Medical Director, Allan J. Fleming, MD, co-authored a study in Industrial Medicine and declared that occupational tumors of the bladder were a "preventable industrial disease."

30.     In his deposition on March 2, 1987, John Zapp, PhD, the Director of DuPont's Haskell Laboratory during the period of 1952 to 1976, testified that by 1955 he was aware of the early animal studies which implicated ortho-toluidine as a carcinogen.  Dr. Zapp also testified that as of 1955 that DuPont had the capability for conducting a study using laboratory animals in order to determine a chemical's carcinogenicity.

31.     In his deposition on July 25, 1991, Blaine McKusick, PhD, the Assistant Director of the Haskell Laboratory from 1974 to 1982, testified that "one of the prime reasons" for the establishment of Haskell Laboratory in the 1930's was to determine the

cause of the bladder tumors at the Chambers Works.  He also testified that, by the 1950's, the Haskell Laboratory had the capability of performing a lifetime rat feeding study using ortho-toluidine in order to determine its potential carcinogenicity.  However, DuPont never performed any type of long-term or lifetime animal testing using ortho-toluidine in order to determine whether it could cause cancer.

32.     In 1954, DuPont published a study on its development of a butyl rubber "Chem-Proof Air Suit," which had a separate air supply and which provided complete body protection against aromatic amine exposure.  On June 17, 1953, the first full-scale field trial of the "Chem-Proof Air Suit" was conducted in an area of the Chambers Works where there was potential for significant exposure to ortho-toluidine.

33.     DuPont tested the effectiveness of the "Chem-Proof Air Suit" by measuring ortho-toluidine levels in the urine of the workers involved in this field trial. DuPont found that the workers who wore the "Chem-Proof Air Suit" had no ortho-toluidine in their urine.  However, another worker in the field trial who was only provided with an air mask, instead of the "Chem-Proof Air Suit," had 3.7 milligrams per liter of ortho-toluidine in his urine.

34.     This DuPont study demonstrated two important principles for protecting workers against ortho-toluidine exposure.  First, ortho-toluidine is readily absorbed through the skin, so that respiratory protection alone, such as an air mask, will not protect a worker against exposure.  Second, in order to measure a worker's total

exposure to ortho-toluidine, a worker's urine must be tested.  DuPont never provided adequate information to either Goodyear or to Plaintiff GARY R. CASTEN about these two important principles that were essential for the safe use of ortho-toluidine.

35.     In 1957, the Goodyear plant in Niagara Falls began using ortho-toluidine. Initially, Goodyear purchased the chemical from DuPont and Allied Chemical.  The Goodyear plant became one of DuPont's largest customers for this chemical, buying millions of pounds per year during the period of the Plaintiff's employment until 1995 when DuPont ceased manufacturing ortho-toluidine.  Allied Chemical supplied Goodyear with ortho-toluidine until 1968.  First Chemical supplied Goodyear with ortho-toluidine from 1967 through the end of the Plaintiff's employment in 2004.

36.     It is undisputed that at all times relevant to this matter that each Defendant was aware that ortho-toluidine was a hazardous, highly toxic chemical, and that toxic levels could be reached in the blood and tissues of an exposed worker by absorption of the liquid through intact skin or inhalation of vapors.  Allied Chemical never provided Goodyear or GARY R. CASTEN with any warnings in any form.  DuPont never provided Goodyear or GARY R. CASTEN with any warnings in any form until 1977.  At all times relevant to this case, DuPont and First Chemical failed to use the exterior of their railroad tank cars, which were the containers that they used to ship the ortho-toluidine to the Goodyear plant, as a means of providing a warning directly to GARY R. CASTEN.  As a result of Defendants' failure to warn, GARY R. CASTEN

suffered two documented incidents of methemoglobinemia.

37.    In 1958, the American Conference of Governmental Industrial Hygienists (ACGIH) adopted a 5 parts per million (ppm) airborne threshold limit value (TLV) for occupational exposure to ortho-toluidine for an eight-hour working day.  In 1971, the U. S. Department of Labor's Occupational Safety and Health Administration (OSHA) adopted this 5 ppm TLV as a permissible exposure limit (PEL).  However, this 5 ppm exposure limit is based on airborne sampling and does not measure a worker's absorption of ortho-toluidine through the skin.  Moreover, in 1958, the ACGIH did not consider the potential carcinogenicity of ortho-toluidine.  Rather, this 5 ppm TLV was intended to only protect against the immediate toxic effects of inhalation of ortho-toluidine vapors, such as methemoglobinemia.

**ALLIED CHEMICAL**

38.    In 1954, Allied Chemical's physician, Dr. Edward Mates, was informed by the Association of British Chemical Manufacturers of ortho-toluidine's potential carcinogenicity.  By November 25, 1958, at the latest, Allied Chemical knew that ortho-toluidine had "been reported as causing bladder tumors in rodents."  In 1962, according to Kelly Ferber, the Technical Manager of Allied Chemical's Buffalo, New York plant, two workers at the Buffalo plant who had been exposed to ortho-toluidine, but to no other bladder carcinogens, had been diagnosed with bladder cancer.  These cases remained a secret; Allied Chemical did not report the cases in any fashion.  By 1974,

115 aromatic amine-exposed workers at Allied's Buffalo plant had been diagnosed with bladder cancer.

## FIRST CHEMICAL

39.     In his deposition on June 15, 1999, First Chemical Vice-President Daniel Anderson admitted that First Chemical had not developed "a method of factoring in skin absorption when determining an employee's total exposure to ortho-toluidine."

40.     In his deposition, Anderson admitted that First Chemical was aware of an appropriate animal model for testing the carcinogenic potential of aromatic amines, but First Chemical had never sponsored or conducted a study with ortho-toluidine.

41.     First Chemical issued material safety data sheets (MSDSs) for ortho-toluidine in May 1977, November, 1985, November, 1986, and on February 1, 1989, July 27, 1992, December 28, 1992, February 6, 1997, October 27, 1997, June 19, 2002, and June 26, 2008.  All First Chemical MSDSs specifically referenced, without explanation or clarification, the obsolete OSHA standard that permitted inhalation of ortho-toluidine up to 5 parts per million in the air.  First Chemical's MSDSs consistently failed to warn that adherence to the 5 ppm OSHA PEL would not protect against cancer.

42.     Moreover, in its MSDSs dated December 28, 1992, February 6, 1997, October 27, 1997, June 19, 2002, and June 26, 2008, First Chemical erroneously advised that the OSHA 5 parts per million permissible exposure limit was "set on the

basis of avoidance of cancer."  First Chemical misrepresented the basis for the 5 ppm exposure limit.

43.     First Chemical's November, 1985 and November, 1986 material safety data sheets also violated OSHA's Hazard Communication Standard by wrongly stating that ortho-toluidine was not listed either as a carcinogen or as a potential carcinogen by the National Toxicology Program (NTP).  In fact, ortho-toluidine had been listed by NTP as "reasonably anticipated to be a human carcinogen" since 1981.

### DuPONT

44.     In 1965, DuPont moved the production of ortho-toluidine at the Chambers Works to a new building.  At the new site, the entire process of ortho-toluidine manufacture occurred in a closed system.  Drumming of ortho-toluidine was performed in a closed drumming booth which provided complete separation of the worker from the chemical.  The workers filled the drums through a glove box arrangement.

45.     In this new building, workers assigned to ortho-toluidine manufacturing wore different sets of protective clothing and equipment, depending upon the work task.

46.     The highest level of worker protection was provided through the use of the "Chem-Proof Air Suit" with a supplied air system.

47.     The next level of personal protective equipment was used on a routine basis in performing certain tasks, including drumming the ortho-toluidine, taking samples, packaging, and loading the chemical into tank trucks and railroad cars.  This

level of personal protective equipment consisted of an "acid suit" which included butyl rubber pants and jacket, butyl rubber or neoprene gloves, safety shoes covered by butyl rubber boots, and an air supplied hood.

48.     The third and minimal level of protective equipment was an acid suit (with jacket, pants, and gloves) without the use of a respirator.  Underneath the acid suit the workers wore company-supplied work clothing.  The company provided underwear as well.  DuPont laundered the work clothing at the plant and provided a fresh uniform to workers each day.  The locker facilities were divided into a clean side and a dirty side, which remained in effect from 1965 to 1995.

49.     DuPont established these stringent precautions in order to protect its own workers against exposure to ortho-toluidine, but never advised Goodyear or Plaintiff GARY R. CASTEN to take the same precautions.

50.     On July 13, 1973, DuPont's Dr. Zapp stated at a hearing of the U. S. Department of Labor's Occupational Safety and Health Administration (OSHA) that: "a workman is entitled to a warning of the hazards of the materials that he works with, and the best scientific means of protection against those hazards. . . .I would feel that the really important thing is to get the message to the workman in such form that he fully understands what the hazards are, and the best means for avoiding them, what are his best and most scientific means of protection."

51.     On June 12, 1974, Dr. Zapp's Haskell Laboratory advised the product

manager for DuPont's sales of ortho-toluidine that the product "may be considered an experimental carcinogen."  Haskell cited studies in animals with ortho-toluidine in which "a high incidence of cancer was again found."  DuPont's Haskell Laboratory concluded its memorandum with the following statement: "[i]n accordance with these hazards, industrial manufacturing procedures and equipment should be designed to preclude employee exposure."  However, DuPont waited until 1977 before providing this information to Goodyear.

52.     On January 12, 1977, DuPont issued its first written information to Goodyear.  DuPont wrote: "While o-Toluidine has been manufactured and processed at our Chambers Works for some fifty years, we have seen no evidence that it ever caused cancer in any of our employees."  DuPont had no scientific basis for making this statement.  As of 1977, DuPont had never conducted an epidemiological study of its workers who had only been exposed to ortho-toluidine.  Rather, by 1977, DuPont had recorded hundreds of cases of bladder cancer among its Chambers Works employees who had been exposed to a combination of aromatic amines, including ortho-toluidine.

53.     DuPont further represented to Goodyear that: "There are no literature references which link cancer in man to o-toluidine exposure."  When it made this statement, DuPont knew it was false because it was specifically contradicted by the 1970 Klebnikova study which reported an outbreak in the Soviet Union of bladder cancer among workers who had been exposed to ortho- and para-toluidine, but not to

15

other bladder carcinogens.

54.    DuPont stated that its 1977 communication had been prompted by an ongoing National Cancer Institute study, in which "tumors were observed in some rats and mice fed o-Toluidine hydrochloride for their lifetime."  DuPont incorrectly labeled this NCI finding as "preliminary," and also failed to inform Goodyear that these results had actually confirmed the findings of the 1940 Morigami study.

55.    DuPont failed to provide Goodyear with adequate instructions for monitoring worker exposure to ortho-toluidine.  DuPont failed to inform Goodyear that DuPont had concluded that only urine testing could accurately measure worker exposure.  Instead, in this 1977 communication, DuPont twice referred to an airborne threshold limit value (TLV) of 5 parts per million, without ever informing Goodyear that DuPont had concluded by July, 1974, at the latest, that air testing "cannot provide by itself a surveillance program adequate for health conservation when significant absorption occurs through the skin."

56.    Upon receipt of DuPont's January 12, 1977 letter, Goodyear sampled the air in those areas of the Niagara Falls plant where ortho-toluidine was used.  In his deposition, a Goodyear manager testified that the company was "pleasantly surprised" that all results showed that airborne exposure was below the 5 parts per million threshold limit value.   As a result, Goodyear did not make any "significant changes in the process."  Goodyear management then informed DuPont that it was "surprised" that

16

DuPont "would correspond on this subject with so faint a data basis." DuPont never attempted to correct Goodyear's misconception that the data on ortho-toluidine's carcinogenicity was "faint."

57.    From 1977 and onward, all DuPont material safety data sheets (MSDSs) specifically referenced the obsolete OSHA 5 ppm permissible exposure limit (PEL), without explanation or clarification that this limit was not intended to protect against cancer. See DuPont material safety data sheets for ortho-toluidine dated November, 1975, December 9, 1976, October, 1979, June, 1980, August, 1983, October, 1985, September, 1987, November, 1988, October 4, 1990, October 8, 1990, March 7, 1991, September 3, 1993, January 20, 1995, and November 23, 1995. All of these MSDSs failed to warn that adherence to the 5 ppm OSHA PEL would not protect against cancer.

58.    None of these communications ever advised Goodyear of the necessity of conducting routine sampling of an exposed worker's urine in order to accurately measure a worker's total exposure to ortho-toluidine. None of these communications ever provided Goodyear with a method to measure a worker's urinary ortho-toluidine level.

59.    Consequently, Goodyear never conducted any surveys to determine its workers' urinary ortho-toluidine levels until 1992. Rather, Goodyear only checked the air and repeatedly assured its workers that "all area and personnel exposure levels are

17

well below the TLV's and permissible exposure levels (PEL's)" for ortho-toluidine.

60.     DuPont also failed to keep Goodyear informed of the growing scientific literature which reported cases of bladder cancer in workers exposed to ortho-toluidine.

61.     In 1978, Genin published a study entitled "Prevention of Occupational Urinary Bladder Tumors in the Manufacture of Toluidines."  DuPont had the 1978 Genin study translated into English.  The study reported that 36 workers had developed bladder tumors who had been involved in the production of toluidines. The authors wrote that the "leading etiologic role in the development of the disease falls to o-toluidine." The authors concluded that:

>  The results of experimental, hygienic, and occupational studies attest to the carcinogenicity of o-toluidine.

DuPont never communicated the results or conclusions of the Genin study to Goodyear.

62.     DuPont obtained the Genin study by March 11, 1980.  However, no mention of it was made in DuPont's data sheet for ortho-toluidine issued on April 10, 1980 or in material safety data sheets dated June, 1980 and August, 1983, or at any other time.  Moreover, DuPont represented to Goodyear in its April 10, 1980 ortho-toluidine data sheet that "we have no information that it has caused cancer in humans."

63.     In addition, all DuPont material safety data sheets for ortho-toluidine issued between 1983 and 1995 either failed to report or inaccurately reported the statistically significant findings of a study published by G. F. Rubino in 1982.  In an

18

Italian manufacturing plant handling ortho-toluidine, Rubino reported that the observed to expected ratio for death due to bladder cancer was 62.50 (five deaths observed; 0.08 expected) among workers with exposure to ortho-toluidine, a result which was highly statistically significant.  Rubino "concluded that. . .o-toluidine. . .should be regarded as almost certainly capable of causing cancer of the bladder in man."

64.     By 1951, DuPont was routinely testing its exposed workers' urine for aromatic amine exposure, including ortho-toluidine.  By no later than 1986, a finding by DuPont of any amount of ortho-toluidine in a worker's urine sample was considered "elevated," and a review was initiated in order to determine how that worker had been exposed.  DuPont relied upon this procedure in order to protect its workers from exposure to ortho-toluidine, but never transmitted these instructions to Goodyear.

65.     In December 1989, NIOSH reported that in Goodyear workers with definite exposure to ortho-toluidine, the excess incidence of bladder cancer was greater than 6-fold (a standard incidence ratio of 6.64, which was statistically significant).

66.     In 1990, NIOSH conducted biological monitoring of the Goodyear workers' exposure by measuring their urinary ortho-toluidine levels both before and at the end of the workday.  This NIOSH study was the first time that the Goodyear workers' urine had been checked in order to determine the workers' total exposure to ortho-toluidine.

67.     In this 1990 study, Plaintiff GARY R. CASTEN provided NIOSH with both a pre-shift and post-shift urine sample.  The resulting data showed that his post-shift

ortho-toluidine level was five times higher than his pre-shift level, which was "conclusive evidence" that GARY R. CASTEN had absorbed ortho-toluidine into his body during the workshift.

68.     In its 1992 report on its industrial hygiene study of the Goodyear plant, NIOSH reported that the highest post-shift urinary ortho-toluidine level in the Goodyear workers was 527 micrograms of ortho-toluidine per liter of urine.

69.     By April 20, 1993, research performed by DuPont scientists had determined that exposure to ortho-toluidine at the OSHA permissible exposure limit (PEL) of 5 parts per million for an 8-hour work day would result in an ortho-toluidine concentration in the urine of 20 milligrams per liter.  Such a urinary concentration would be 37 times higher than 527 micrograms of ortho-toluidine per liter, the highest level found by NIOSH in the Goodyear workers, whose risk for bladder cancer had been determined to be greater than 6-fold.

70.     As of April 20, 1993, DuPont was aware of three critical facts: (a) the 5 ppm exposure limit was never set to protect against cancer, (b) inhalation of 5 ppm of ortho-toluidine over an 8-hour day would produce a urinary concentration of ortho-toluidine of 20 milligrams per liter, and (c) there was a documented excess risk for bladder cancer in the Goodyear workers who had been exposed to ortho-toluidine at levels well under 5 parts per million and whose highest urinary concentrations of ortho-toluidine were significantly less than 20 milligrams per liter.

71.     However, DuPont never notified Goodyear, OSHA, NIOSH or the U. S. Environmental Protection Agency (USEPA) of these significant findings in 1993 or at any later time.  Specifically, all DuPont material safety data sheets issued after April 20, 1993 continued to list the 5 ppm OSHA PEL as an "exposure limit" and "exposure guideline" without any warning as to the amount of ortho-toluidine that would ultimately result in the human body after such "permissible" exposure and the resulting increased risk of developing bladder cancer.

72.     In 1976, the United States Congress passed the Toxic Substance Control Act (TSCA), 15 U.S.C. § 2601.  One of its purposes was "to regulate chemical substances and mixtures which present an unreasonable risk of injury to health and the environment, and to take action with respect to chemical substances and mixtures which are imminent hazards."  Sec. 2(b)(2).

73.     Section 8(e) of the Toxic Substances Control Act requires a chemical manufacturer to report to the EPA if it finds out something new about a chemical which might pose a substantial risk to human health. TSCA Section 8(e) provides:

(e)     Notice to Administrator of substantial risks

Any person who manufactures, processes, or distributes in commerce a chemical substance or mixture and who obtains information which reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment shall immediately inform the Administrator of such information unless such person has actual knowledge that the Administrator has been adequately informed of such information.

15 U.S.C. § 2607(e).  This provision serves as an "early warning" mechanism for

keeping the EPA and others apprised of newly-found serious chemical hazards.

74.    On February 2, 1995, DuPont sent a report to the USEPA under TSCA

Section 8(e) (USEPA submission no. 88950000128).  DuPont reported that: "Based on

all available toxicity data. . .the existing worker exposure limit (Acceptable Exposure

Limit, AEL) was reviewed and its validity at 5 ppm, 8- and 12-hr. time weighted average,

confirmed."

75.    DuPont made a knowingly false report to the USEPA on February 2,

1995.  As of the date of the filing of this Complaint, this submission has not been

corrected by Defendant DuPont.

## VI.  NOTICE TO DUPONT DE NEMOURS, INC.
## OF INTENT TO FILE A CITIZEN'S CIVIL ACTION PURSUANT TO 15 U.S.C § 2619

76.    Pursuant to the Toxic Substances Control Act, 15 U.S.C. § 2619(a)(1) and

(b)(1)(A), Plaintiff GARY R. CASTEN hereby gives notice to Defendant DuPont de

Nemours, Inc., as successor-in-interest to E. I. du Pont de Nemours and Company,

that, on or after 60 days from service of this Complaint on you, the Plaintiff will move to

amend the within Complaint in order to add a citizen's civil action pursuant to 15 U.S.C.

§ 2619, unless appropriate action has been taken by Defendant DuPont in the interim,

with notice to the Plaintiff, that: (a) fully informs the Administrator of the United States

Environmental Protection Agency of the substantial risk of injury of health of which

DuPont was aware as of April 20, 1993 concerning the resulting urinary concentrations

of ortho-toluidine after exposure to 5 parts per million for an 8-hour day, (b) fully

corrects all errors and misrepresentations by DuPont in its February 2, 1995 submission

to the Administrator of the United States Environmental Protection Agency (submission

no. 88950000128), and (c) provides the Administrator of the United States

Environmental Protection Agency with all information within the Defendant's

possession, custody or control concerning potential urinary ortho-toluidine levels after

exposure to 5 parts per million in the air and the resulting substantial risk of injury.

Pursuant to 15 U.S.C. § 2619, the Plaintiff will seek to restrain any ongoing and future

violations of the Toxic Substances Control Act by Defendant DuPont with respect to its

failure to immediately inform the Administrator of the United States Environmental

Protection Agency, pursuant 15 U.S.C. § 2607(e), of such substantial risks of injury to

human health.  Please be further advised that this Court, in issuing any final order in

any action brought pursuant to 15 U.S.C. § 2619(a)(1), "may award costs of suit and

reasonable fees for attorneys and expert witnesses if the court determines that such an

award is appropriate."  15 U.S.C. § 2619(c)(2).

## VII.  **CAUSES OF ACTION**.

FIRST CAUSE OF ACTION
AS AGAINST THE DEFENDANTS
(NEGLIGENCE)

77.     Plaintiff repeats each and every allegation of this Complaint with the same

force and effect as if more fully set forth herein.

78.     The Plaintiff alleges that each Defendant was negligent in the manufacture, testing and labeling of the aforementioned ortho-toluidine in that the Defendants, acting by and through their duly authorized agents, servants and employees, were guilty of the following acts and omissions, each of which were and do constitute negligence:

a.     Defendants failed to exercise reasonable care in researching, testing, manufacturing, marketing, supplying, promoting, packaging, labeling, selling, distributing, and in conducting their product stewardship of ortho-toluidine;

b.     Defendants failed to exercise ordinary care and/or were reckless in conducting their product stewardship of ortho-toluidine and in researching, testing, manufacturing, marketing, supplying, promoting, packaging, labeling, selling, and/or distributing ortho-toluidine into interstate commerce in that Defendants knew or should have known that occupational exposure to ortho-toluidine carried a risk of unreasonable and dangerous side effects, including bladder cancer;

c.     Defendants failed to adequately and timely warn of the serious health hazards, including bladder cancer, associated with occupational exposure to ortho-toluidine;

d.     Defendants failed to adequately and timely warn that appropriate engineering controls and protective equipment should be used when working with said ortho-toluidine;

24

e.      Defendants failed to properly and adequately test the said product before it was made available for commercial use; and, after marketing began, the Defendants failed to properly and adequately test the said product after reports of its potential carcinogenicity were published; and,

f.      Defendants failed to provide adequate instructions for the safe use of the product with the said product, including a warning that workers' exposure should be measured by testing urinary ortho-toluidine levels and by providing instructions for monitoring such exposure.

79.     Each and all of the foregoing acts and omissions taken singularly or collectively were a direct and proximate cause of the injuries suffered by the Plaintiff.

SECOND CAUSE OF ACTION
AS AGAINST DEFENDANTS
(STRICT PRODUCTS LIABILITY - FAILURE TO WARN)

80.     Plaintiff repeats each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

81.     The ortho-toluidine to which the Plaintiff GARY R. CASTEN was exposed was manufactured by the Defendants and was subsequently sold by the Defendants in interstate commerce to the employer of GARY R. CASTEN.  Said ortho-toluidine left the hands of the Defendants in a defective and unreasonably dangerous condition in that:

a.      Said ortho-toluidine did not contain an adequate and timely warning regarding the serious health hazards, including bladder cancer, associated with

25

occupational exposure to ortho-toluidine;

        b.     Said ortho-toluidine did not contain an adequate and timely warning of the appropriate engineering controls and protective equipment that should be used when working with said ortho-toluidine; and,

        c.     Said ortho-toluidine did not contain any warnings that workers' exposure should be measured by testing urinary ortho-toluidine levels and the product failed to carry any instructions for conducting such testing.

        82.     Any warnings or instructions provided by the Defendants for ortho-toluidine during the time period when the Plaintiff was exposed were misleading, incomplete, erroneous, or otherwise inadequate to alert Goodyear and the Plaintiff as to how to safely use this product and how to protect the Plaintiff against the risk of cancer caused by exposure to this product.

        83.     Each Defendant was engaged in the business of manufacturing and/or distributing ortho-toluidine which, without substantial change in its condition after it was sold, was the producing cause of the health problems of the Plaintiff and his aforementioned damages.

        84.     The Plaintiff was unaware of the dangerous propensities of ortho-toluidine which rendered it unsafe for its intended use.  At the time when GARY R. CASTEN was exposed to this product, such use was in a manner that was normally intended and reasonably anticipated by the Defendants.

### VIII.  <u>PUNITIVE DAMAGES</u>.

85.     Plaintiff repeats each and every allegation of this Complaint with the same force and effect as if more fully set forth herein.

86.     The actions and inactions of each of the Defendants as specifically alleged herein above were aimed against the public as well as the Plaintiff, were grossly unjust and involved high moral culpability, and were of such a character as to indicate that they were the result of reckless, wanton, and willful disregard for the rights, welfare and safety of the Plaintiff, GARY R. CASTEN.  Therefore, said Defendants are guilty of willful or wanton negligence or recklessness and conscious disregard for the rights of others for which they should be held liable in punitive and exemplary damages to the Plaintiff.

### IX.  <u>PRAYER FOR RELIEF</u>.

87.     WHEREFORE, PREMISES CONSIDERED, the Plaintiff, GARY R. CASTEN, demands judgment against the Defendants and each of them jointly and severally for compensatory and special damages in a sum in excess of $75,000.00, for punitive damages, for attorneys' fees, for their costs expended herein, for interest, and for such other and further relief both at law and in equity to which the Plaintiff may show himself to be justly entitled.

### X.  <u>JURY DEMAND</u>.

88.     COMES NOW the Plaintiff, GARY R. CASTEN, and pursuant to Rule 38

of the Federal Rules of Civil Procedure, demands that all issues of fact in this cause be

tried to a properly impaneled jury.

BY:   s/Steven H. Wodka
      STEVEN H. WODKA
      Attorney for Plaintiff
      577 Little Silver Point Road
      P. O. Box 66
      Little Silver, NJ 07739-0066
      (732) 530-2815
      shw@wodkalaw.com


JOHN N. LIPSITZ
Local Counsel for Plaintiff
Lipsitz & Ponterio, LLC
424 Main Street, Suite 1500
Buffalo, NY 14202
(716) 849-0701
jnl@lipsitzponterio.com


Dated: January 4, 2021